IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

M. STANLEY SHIPP,

    Plaintiff,

v.                            No. 04-2144 B

UNITED STATES OF AMERICA,

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This lawsuit has been brought by the Plaintiff, M. Stanley Shipp, against the United States of America ("USA"), pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671, et seq. ("FTCA"). In the instant motion, the Defendant moves for dismissal under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment in accordance with Fed. R. Civ. P. 56.[1]

---

[1] The Court deems it necessary at this point to comment on the assertion by the Plaintiff as set forth in his response that the Defendant failed to come forward with appropriate documentary evidence in support of its claims. Attachments numbered 3 through 6 bore the designation "to be supplemented." These attachments included portions of the deposition of Walter L. Watkins, Danny Swindall, Ray Greer and Gloria Earle, respectively. In its motion and memorandum, the USA advised the Court that

> Defendant has not yet received the actual transcripts of the depositions of Watkins, [Swindall], Greer and Earle from the court reporter who took the depositions and is, therefore, unable to provide the Court with specific citations to the transcripts. However, the Defendant will supplement this statement of undisputed material facts after receipt of the transcripts and provide those references.

(Mot. and Mem. in Supp. of Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. at 2.) On July 15, 2005, the Court granted the Defendant's motion to supplement its motion and memorandum with the deposition transcripts. In his response to the motion, the Plaintiff averred

The following facts are undisputed unless otherwise noted. In March 2000, Walter Watkins was employed as a letter carrier by the United States Postal Service and worked out of the Desoto Station in Memphis, Tennessee. (Dep. of Walter L. Watkins ("Watkins Dep.") at 11.) At that time, Danny M. Swindall, who is now retired, was employed as a postal inspector. (Dep. of Danny Merle Swindall ("Swindall Dep.") at 6.) His duties encompassed the investigation of internal and external crimes dealing with the postal service, that is, theft of mail, robbery of carriers, threats of violence against carriers, and internal theft. (Swindall Dep. at 12.)

During March 2000, Watkins delivered mail on a route that included a business owned by the Plaintiff located at 1383 Elvis Presley in Memphis. (Watkins Dep. at 34-37.) According to the Defendant, prior to March 11, 2000, Watkins advised Shipp that delivery of mail to his business required an appropriate mail receptacle. (Watkins Dep. at 46-49, 54.) The Plaintiff did not provide such a receptacle and delivery of mail to the Elvis Presley address was discontinued. (Watkins Dep. at 59-64.) Watkins claimed that, on March 11, 2000 as he was delivering the mail, Shipp, driving a gray 1989 Dodge Caravan, accelerated and attempted to run him down while cursing him and uttering profanities. (Watkins Dep. at 64, 134-35.)

The Plaintiff's version of events is radically different. In his declaration, he avers that Watkins neither advised him of the need for a mail receptacle nor ceased delivery of mail to his business address based on his lack of such a receptacle. (Decl. of M. Stanley Shipp ("Shipp Decl.") at ¶¶ 2-3.) He further denied attempting to run down or uttering profanities at the carrier. (Shipp

---

that he too should be permitted to supplement his memorandum with supplemental documentation, which he did by filing his declaration with the Court on September 27, 2005. As a consequence, any argument by Shipp that summary judgment should be denied on the grounds that the USA failed to support its motion with documentary evidence is at this point without merit.

Decl. at ¶ 4.) According to the Plaintiff, he stopped his van on the other side of the street from Watkins and had a conversation with him about non-delivery of his mail. (Shipp Decl. at ¶¶ 5-6.) After Watkins informed him that his mail was being held by the postal station located at 161 Calhoun, Shipp had no further contact with the carrier and went directly to the station, where he picked up his mail from Watkins' supervisor, Donald Ray Greer. (Shipp Decl. at ¶¶ 7-8.)

It is undisputed that the carrier used a telephone at a residence located at 1112 Kerr to call the Desoto Station and report the incident to Greer. (Watkins Dep. at 135.) He also called the Memphis Police Department ("MPD"). (Watkins Dep. at 135.) Greer testified in his deposition that, as a result of Watkins' call, he contacted the Postal Inspection Service and informed Swindall of the report. (Dep. of Donald Ray Greer ("Greer Dep.") at 61.) Two days later, Swindall interviewed Watkins, who provided him with a written narrative of the occurrence and stated that children playing in the yard at 1112 Kerr may have observed it. (Swindall Dep. at 66-67, 73.) Swindall stated in his deposition that he also interviewed the Plaintiff and Jermaine Alexander, a juvenile residing at 1112 Kerr. (Swindall Dep. at 71, 73-74.) The postal inspector recalled that Alexander told him he saw Watkins jump onto the sidewalk in order to avoid being struck by a man in a gray van who cursed and threatened the carrier. (Swindall Dep. at 74-79.) Afterward, Swindall prepared an internal report that was placed in the casefile. (Swindall Dep. at 84.) He also advised Watkins of his interviews with Alexander and Shipp and instructed him that, if he wanted to file charges, he was to contact MPD. (Swindall Dep. at 85.) The inspector spoke on the telephone with MPD Sergeant Charns, who asked him "what [he] had come up with." Swindall advised that he had statements from Watkins and Alexander, as well as a memorandum of interview with Shipp, of which Charns requested copies. (Swindall Dep. at 88-89.) Since Alexander was a juvenile, Charns

3

did not request a copy of his statement. (Swindall Dep. at 89.) Nor did Charns ask for Swindall's field notes. (Swindall Dep. at 89.)

Swindall averred in his deposition that, when the grand jury convened, he was informed by an assistant district attorney that he would need to testify before the body, which he did pursuant to a subpoena. (Swindall Dep. at 90.) During the meeting, which Swindall insisted was the only time he met with anyone in the district attorney's office about his investigation, the inspector and the district attorney briefly went over what Watkins and Shipp had said to him. (Swindall Dep. at 87, 89.) Although Watkins was also subpoenaed to testify, he did not in fact appear before the grand jury. (Swindall Dep. at 96-97.) Swindall was also advised by the district attorney that the charge against Shipp was to be amended from aggravated assault to reckless endangerment. (Swindall Dep. at 94.) The reason for the change, according to the district attorney, was that the use of a motor vehicle warranted the increase. (Swindall Dep. at 95.) He denied prosecuting the matter himself before the grand jury, noting that he had no input with respect to whom they requested to testify. (Swindall Dep. at 92.) Nor did he have any input in the changing of the charge. (Swindall Dep. at 95.) However, the indictment document marked "No True Bill" bore Swindall's name with the designation "Prosecutor" underneath. (Swindall Dep. at 94.) The inspector was also listed on the indictment twice as a witness for the state. (Swindall Dep. at 105.) He recalled that the assistant district attorney he spoke with prior to the grand jury proceeding was not present during the proceeding. (Swindall Dep. at 94.) Swindall denied preparing the document or having knowledge of the prosecutor designation prior to its being pointed out during the deposition. (Swindall Dep. at 97.) It was his assumption, he claimed, that the bill was drafted by the district attorney's office. (Swindall Dep. at 98.)

4

According to Swindall, it was his understanding that, when he turned over the statement and memorandum with respect to his interviews with Shipp and Watkins to Charnes, his role in the investigation was concluded and MPD assumed responsibility for whatever was to occur thereafter. (Swindall Dep. at 108.) At some point, he was advised by Charnes that Watkins had come to the station and picked Shipp out of a lineup and that he had filed a complaint against the Plaintiff. (Swindall Dep. at 109.) A preliminary hearing was conducted, at which Watkins testified but Swindall did not. (Watkins Dep. at 179-80.) Thereafter, Charnes informed Swindall that Shipp was being bound over to the grand jury. (Swindall Dep. at 106.) At that point, the district attorney's office had control of the case. (Swindall Dep. at 106.) The inspector visited Shipp's business in order to determine whether he had obtained a proper mail receptacle. At that time, he notified the Plaintiff that a warrant had been issued for his arrest. (Swindall Dep. at 99.) Shipp was advised that he could turn himself in to Swindall's office or to MPD. (Swindall Dep. at 110.) Later that day or the next, Swindall received a telephone call from an attorney representing Shipp, who he advised about the warrant. (Swindall Dep. at 110.) The grand jury declined to indict Shipp. Swindall informed Watkins thereof, closed his casefile and took no further action in the matter. (Swindall Dep. at 44, 64, 102.)

In his complaint, Shipp alleged that Watkins and Swindall "initiated and caused the filing of criminal charges of Reckless Endangerment and Aggravated Assault in the Shelby County General Sessions Criminal Court against Plaintiff in March, 2000." (Compl. at ¶ 7.) The two also allegedly prosecuted the charge of aggravated assault against Shipp during the July 2001 term of the Shelby County grand jury. The Plaintiff avers that the USA's employees knew or willfully and maliciously failed and refused to investigate the truth and circumstances surrounding their allegations.

5

According to Shipp, the charges were brought in retaliation for his prior complaints about delivery of his mail and possible criminal conduct on the part of Watkins. The Plaintiff claims that, as a result of malicious prosecution by the Defendant, he has suffered humiliation, embarrassment, mental anguish, and loss of income and business profits.

The Defendant first argues that, pursuant to Rule 12(b)(1), subject matter jurisdiction is lacking as to the Plaintiff's claims concerning Watkins. Rule 12(b)(1) permits dismissal of a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). "When the defendant challenges subject matter jurisdiction, the plaintiff has the burden of proving jurisdiction and the court may resolve factual disputes." Robinson v. Ohio, Dep't of Dev., 69 F.App'x 204, 205 (6th Cir. 2003) (citing Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986)). "The plaintiff must show only that the complaint alleges a claim under federal law, and that the claim is 'substantial.' A federal claim is substantial unless 'prior decisions inescapably render it frivolous.'" Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1248 (6th Cir. 1996), reh'g and suggestion for reh'g en banc denied (Jan. 15, 1998) (citations and internal quotation marks omitted).

The USA contends that dismissal is appropriate under Rule 12(b)(1) on the grounds of sovereign immunity. "The Supreme Court has recognized the general principle that the United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. . . . Like a waiver of immunity itself, . . . [the] Court has long decided that limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." Chomic v. United States, 377 F.3d 607, 615 (6th Cir. 2004), cert. denied, ___ U.S. ___, 125 S.Ct. 1693, 161 L.Ed.2d 524 (U.S. Mar. 28, 2005) (No. 04-694) (citing Lehman v. Nakshian,

6

453 U.S. 156, 160-61, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981)). Through its enactment of the FTCA, Congress has waived the United States' immunity from suits "respecting the provisions of [the statute] relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

This waiver of sovereign immunity is subject to certain limitations enumerated in 28 U.S.C. § 2680(a). See 28 U.S.C. § 2680(a) (28 U.S.C. §1346(b)'s waiver of sovereign immunity has no application to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"); Sharp ex rel. Estate of Sharp v. United States, 401 F.3d 440, 443 (6th Cir. 2005). If one of the exceptions applies and Congress has not otherwise waived the United States's immunity, the Court lacks subject matter jurisdiction over the action. See Sharp, 401 F.3d at 443. The exception relevant to this case provides as follows:

[the waiver] shall not apply to--

      \*   \*   \*

[a]ny claim arising out of assault, battery, false imprisonment, false arrest, *malicious prosecution*, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the [statutory] provisions . . . shall apply to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or *malicious prosecution*. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violation of Federal law.

28 U.S.C. § 2680(h) (emphasis added). "Intentional torts arising out of 'acts or omissions of investigative or law enforcement officers' are thus not excepted from government liability." Flechsig v. United States, 991 F.2d 300, 302 n.1 (6th Cir. 1993). It is undisputed that Watkins, unlike

7

Swindall, was not an "investigative or law enforcement officer" as defined under subsection (h). Indeed, the complete failure of the Plaintiff to respond to the Defendant's argument as to Watkins suggests that he has abandoned his claim relative to the letter carrier. In any case, the Court finds that the USA's motion to dismiss Shipp's claim in connection with Watkins' liability pursuant to Fed. R. Civ. P. 12(b)(1) should be GRANTED.

At this point, the Court turns its attention to the Plaintiff's assertions as to Swindall. The Defendant bases its dispositive motion on Rule 12(b)(6) or, in the alternative, Fed. R. Civ. P. 56. Rule 12(b)(6) requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998). However, the Court is not required to "accept as true legal conclusions or unwarranted factual inferences." Id. In order to avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim to sustain recovery under some viable legal theory. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003); Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 406 (6th Cir. 1998).

The Rule further provides that, "[i]f, on a motion asserting the defense number (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . ." Fed. R. Civ. P. 12(b). As the Defendant has submitted documentary evidence in support of its motion, the Court will analyze the motion under Rule 56, which states in pertinent part that a

8

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

Claims under the FTCA are to be analyzed pursuant to the substantive law of the state in which the incident occurred. 28 U.S.C. § 1346(b)(1) ("the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under

9

circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"); F.D.I.C. v. Meyer, 510 U.S. 471, 478, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994); Washington v. Drug Enforcement Admin., 183 F.3d 868, 873 (8th Cir. 1999), reh'g and suggestion for reh'g en banc denied (Oct. 8, 1999). In order to prevail on a claim of malicious prosecution under Tennessee law, "[a] plaintiff must show (a) that a prior lawsuit or judicial proceeding was brought against the plaintiff without probable cause, (b) that the prior lawsuit or judicial proceeding was brought against the plaintiff with malice, and (c) that the prior lawsuit or judicial proceeding terminated in the plaintiff's favor." Parrish v. Marquis, ___ S.W.3d ___, No. E2004-00875, SC-R11-CV, 2005 WL 2058902, at *3 (Tenn. Aug. 29, 2005) (citing Christian v. Lapidus, 833 S.W.2d 71, 73 (Tenn.1992)). "The action for malicious prosecution is only intended to apply to cases where criminal accusation has been made against an innocent man through malice, and in the absence of even a fair and reasonable probability of its truth." Jones ex rel. Adams v. Shelby County, Tenn., No. 02-2560-D, 2003 WL 23924841, at *2 (W.D. Tenn. Sept. 19, 2003) (citing Sadek v. Nashville Recycling Co., 751 S.W.2d 428, 431 (Tenn. Ct. App.1988)).

As a preliminary matter, the Defendant argues that this claim must be dismissed on the grounds that Swindall was not in fact the person who brought the prior proceeding against the Plaintiff. In doing so, it refers the Court to an unpublished Tennessee Court of Appeals decision, Mitchell v. Van Zyll, No. E2003-01594-COA-R3-CV, 2004 WL 689955 (Tenn. Ct. App. Mar. 31, 2004), which, upon review, does nothing to further its cause.

In Mitchell, the plaintiff sued his next door neighbors, John Van Zyll and Ann Furlong, for malicious prosecution for causing a criminal warrant to be issued against him for aggravated assault

and reckless endangerment arising from an incident in which the plaintiff fired a gun out his window to quiet some dogs penned on the defendants' property. Mitchell, 2004 WL 689955, at *1. The incident was reported to authorities by Furlong via a 911-call. Id. While the police responded to the call, they did not approach the plaintiff's property. Further, the court found that "[a]lthough Furlong placed the 911 call which resulted in the initial police response, it is undisputed that Plaintiff neither was arrested nor had a judicial proceeding instituted against him as a result of this call." Id. at *3. Finally, Furlong's name did not appear on the warrant. Id. Thus, the court concluded that, as "Furlong did not institute or bring the criminal proceedings against the Plaintiff," his malicious prosecution claim against her must fail. Id.

It is significant, however, that the only issue on appeal involved the claim against Furlong. The state trial court denied the motion for summary judgment of Van Zyll, who had met with the district attorney and then swore out the warrant against the plaintiff. Id. at *1-2. The evidence in this case indicates that Swindall was far more active in this case than was Furlong and, arguably, even Van Zyll. As a consequence, the Court is unwilling to grant summary judgment based on the USA's Mitchell argument.

The Court now turns to the elements of the malicious prosecution claim. Since it is undisputed that the grand jury failed to return an indictment and, therefore, the criminal proceeding was terminated in Shipp's favor, the third element of the malicious prosecution claim is satisfied, leaving only the first and second to be addressed here.

"Probable cause is established where facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." Roberts v. Federal Express Corp., 842 S.W.2d 246, 248 (Tenn. 1992) (citations and internal quotation marks omitted);

11

see also Hill v. White, 190 F.3d 427, 431 (6th Cir. 1999) (citing Roberts). In a malicious prosecution case, "probable cause requires only the existence of such facts and circumstances sufficient to excite in a reasonable mind the belief that the accused is guilty of the crime charged." Roberts, 842 S.W.2d at 248. Where a plaintiff alleging malicious prosecution had an opportunity to litigate probable cause by way of a preliminary hearing conducted in the prior proceeding, even if the grand jury later chose not to indict, he may not relitigate the issue of probable cause in a subsequent action. Franklin v. Messmer, 111 F.App'x 386, 388 (6th Cir. 2004), reh'g en banc denied (Nov. 10, 2004); see also Smith v. Thornburg, 136 F.3d 1070, 1077 (6th Cir. 1998), reh'g and suggestion for reh'g en banc denied, 144 F.3d 409 (6th Cir. 1998) ("The law of our Circuit provides that where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent" action). In this case, it is not disputed that a preliminary hearing was conducted and that Shipp was bound over to the grand jury. He has not alleged any wrongdoing with respect to that hearing. Accordingly, the Plaintiff has failed to satisfy the first element of the malicious prosecution claim.

Malice, unlike probable cause, "generally addresses the subjective mental state of the defendant." Hill, 190 F.3d at 433 (citing Roberts, 842 S.W.2d at 248). "Any improper motive is sufficient to constitute malice when malicious prosecution is charged. Ill will or personal hatred need not be shown, though these would certainly be sufficient to establish malice." Kelley v. Tomlinson, 46 S.W.3d 742, 746 (Tenn. Ct. App. 2000), app. denied (Apr. 16, 2001) (internal citations omitted). A showing of an honest belief that the underlying prosecution had an appropriate basis and that it was conducted in good faith is evidence that malice is lacking. See Hill, 190 F.3d

12

at 433.

In support of his position that malice was present here, Shipp offers his declaration, in which he states that "[a] few days [after the incident], [he] asked Postal Inspector Dan [Swindall] to talk to all the witnesses present at the scene near 1112 Kerr Street which included a number of children and adults" and that "[p]rior to March 11, 2000, [he] informed Postal Inspector Dan [Swindall] and Ray Greer that Walter Watkins may have been involved in drug dealing or taking drugs." (Shipp Decl. at ¶¶ 9-10.)

Swindall's testimony relevant to Shipp's contentions is as follows:

A: . . . [Shipp] claimed Watkins was to be a drug dealer and various other, you know, things. Had saw him, you know, around the neighborhood, supposedly after work and things of that nature.

Q: In regard to this statement concerning Watkins being a drug dealer, did you ask Mr. Watkins about that?

A: No, sir.

Q: Did you engage in any further investigation concerning that allegation?

A: Yes, sir.

Q: You did?

A: Yes, sir.

Q: By doing what?

A: I talked with the station manager regarding Mr. Watkins. And asked him if there had been any problems in his behavior or attendance, work or anything of that nature.

Q: What did your investigation reveal?

A: The manager said he had not had any problems with him.

13

Q: Now, would that manager -- that would have been Graylin Johnson?

A: Yes, sir.

Q: Do you know if Mr. Johnson or any other supervisor had ever talked with Mr. Watkins about any drug problem?

A: No, sir. I'm not aware of that.

Q: Now, I believe that Mr. Shipp told you about some kids who were playing in the yard that day; is that correct?

A: Yes, sir. I believe he did mention that there were some children playing.

Q: And did he ask you to talk to those kids, those children?

A: He mentioned that they may have seen something.

Q: As a result of his statement concerning the kids, did you follow-up with trying to talk with them?

A: Yes, sir.

Q: Did you talk with any of the children?

A: Yes, sir.

Q: Do you recall the children or their names?

A: I remember talking to Jermaine Alexander, probably about 9 or 10 years old, 11, somewhere along in there.

Q: Anyone else?

A: There was another child there with him when I -- when I interviewed him. But I did not get his name because he didn't -- he wasn't there on the day of the incident, but Jermaine was.

Q: Now, you said Jermaine was about 9 or 10 at that time?

A: That's my best recollection.

Q: Did he provide a written statement?

14

A: No, sir.

Q: Was the interview tape-recorded?

A: No, sir.

Q: Was there any reason that you didn't ask for a written statement or that it be tape-recorded, the interview with Mister -- Jermaine Alexander?

A: Was there a --

Q: Was there any reason that you did not ask for a written statement from Jermaine or have the interview tape-recorded?

A: No, sir.

Q: You said there was another child there, a male child?

A: Yes. I left Mr. Shipp's place of employment and went to the area where this incident allegedly occurred. And as I said, there were two small children out in the driveway. And Jermaine had been there on [the] day of the accident, but the other individual had not.

Q: What address were you talking to these children at?

A: I don't recall the specific address. But it's on the corner -- on the corner of two streets there.

Q: Where you were told that the alleged incident occurred?

A: Yes. I don't recall the name of the street.

Q: So you went to this location and you happened to see these kids, two male children out in the yard. Did you talk to their parents?

A: There were no parents there.

Q: They were at home by themselves?

A: Yes.

Q: Did Jermaine tell you who his parents were?

15

A: No.

Q: Did you ask?

A: No.

Q: Do you recall what time of day this was when you talked with Jermaine and this other child?

A: I would say it was probably in the early afternoon because I had already conducted two interviews that day.

\* \* \*

Q: So when you get to the scene and you see the two children in the yard, how did you approach them?

A: I just -- I just parked my vehicle, got out and identified myself as the postal inspector. I asked them were they there that Saturday, and did they witness anything involving the postal carrier. That's basically -- I mean, may not have been exactly those words, but that's basically what --

Q: All right. So when you asked the question if they witnessed anything in regard to the postal carrier, did you specifically indicate the name of the carrier, or do you remember?

A: No, sir. I just -- I just asked them if they were -- I don't think I even mentioned the carrier's name because I figured that they probably wouldn't even know his name. I just asked them, as best I can recall, if they witnessed anything involving the postal carrier last Saturday, or that Saturday before.

Q: All right. So Jermaine identified himself after you had asked that question, or do you recall how he answered?

A: He indicated that he was there and witnessed an altercation or an incident involving the carrier and a gentleman in a gray van.

Q: So Jermaine said, he told you who he was?

A: I asked him his name and he said Jermaine, as best as I recall. He may have told me about the incident first and then I asked him his name. That's probably how it was.

16

Q: And he told you his name was Jermaine Alexander?

A: Uh-huh.

Q: Yes?

A: Yes.

Q: So what did he tell you?

A: He told me that he and a couple of other guys were playing basketball there in the driveway. And that he, basically, saw the carrier run across the street and jump on the sidewalk. And that this van come around the corner and almost hit the carrier. And told him if he didn't get his damn mail, he was going to kill him.

Q: So you're saying that Jermaine indicated to you that he saw the carrier jump on the sidewalk, and then the van came around the corner?

A: The van -- the van came around the corner and almost hit the carrier, and the carrier jumped up on the sidewalk. And that the gray van pulled in -- basically, kind of into their driveway. And that's when he said that the driver of the van was yelling at the carrier, you know. I can -- I can -- I can basically tell you a couple of words that he said. Because I was, you know, a little shocked that the little guy remembered what he actually, you know, said.

Q: So the driver of the van, you said, was cursing at the carrier?

A: In fact, he said he called -- Jermaine said, he called him a God damn motherfucker. He said, if you don't give me my mail, I'm going to kill you.

Q: And you said you, specifically, remember Jermaine making these statements?

A: Yes. Because I thought it was a little -- I -- I wouldn't have expected a -- you know, a 9 or 10 or 11-year-old, or whatever, to -- to remember that, but he did.

(Swindall Dep. at 72-80.)

Thus, the evidence presented in this case indicates that, after he spoke with the Plaintiff, the postal inspector returned to the scene of the incident and interviewed one of the children who

17

witnessed it and made inquiries within the postal service relative to Shipp's assertion that Watkins was a drug user and/or seller. The Plaintiff has offered no evidence in response to the motion to suggest postal authorities failed either to properly investigate the matter or to address his allegations against Watkins. According to Swindall, his interview with the witness confirmed the carrier's version of events and he discovered nothing to support Shipp's claim Watkins used or sold narcotics. In addition, his investigation confirmed that Shipp did not in fact possess an appropriate mail receptacle. After collecting this information, he passed it on to MPD. Upon viewing the facts in the light most favorable to the Plaintiff, the Court finds that reasonable minds could not differ with respect to the existence of malice, as no improper motive on Swindall's part has been shown. See Cawood v. Haggard, 327 F.Supp.2d 863, 884 (E.D. Tenn. 2004), aff'd sub nom. Cawood v. Booth, 125 F.App'x 700 (6th Cir. 2005) (where defendant took evidence from her investigation to the district attorney for presentation to the grand jury and then testified before the grand jury pursuant to a subpoena, summary judgment on malicious prosecution claim appropriate). As the Plaintiff has failed to establish, as he must, all of the elements of the malicious prosecution claim, the motion of the Defendant for summary judgment is GRANTED. Furthermore, all pending motions in this matter are hereby DENIED as moot. The Clerk of Court is directed to remove the trial date from the Court calendar and enter judgment in favor of the Defendant.

IT IS SO ORDERED this ___ day of October, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 32 in case 2:04-CV-02144 was distributed by fax, mail, or direct printing on October 4, 2005 to the parties listed.

---

Conny Davinroy Beatty
U.S. Postal Service
P.O. Box 66640
St. Louis, MO 63166--664

Ronald C. Wilson
WILSON & ASSOCIATES PA
P.O. Box 1299
West Memphis, AR 72303

Linda N. Harris
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT